U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

2015 MAR 17 PM 4: 14

CLERK

BY _____
DEPUTY CLERK

FABIAN PRIVE,                    )
                                 )
          Plaintiff,             )
                                 )
     v.                          )     Case No. 5:13-cv-320
                                 )
RICHARD WELLS,                   )
                                 )
          Defendant.             )

**OPINION AND ORDER GRANTING DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**
(Doc. 26)

Plaintiff Fabian Prive brings this action pursuant to 42 U.S.C. § 1983 and under
state law against Defendant Newport City police officer Richard Wells. Plaintiff alleges
that Defendant caused him to be arrested and charged without probable cause and that
Defendant used excessive force in the course of the arrest. In addition to federal claims
of false arrest and excessive force (Count One), Plaintiff asserts state law claims against
Defendant for intentional infliction of emotional distress (Count Two), assault and battery
(Count Three), false imprisonment (Count Four), and malicious prosecution (Count
Five).

Pending before the court is Defendant's motion for summary judgment. (Doc.
26.) Defendant argues that, based upon the undisputed facts, he is entitled to judgment as
a matter of law in his favor because Plaintiff's arrest and prosecution were supported by
probable cause, or, alternatively, by arguable probable cause that would entitle Defendant
to qualified immunity. Defendant further argues that his use of force was reasonable, or,
alternatively, was objectively reasonable under the circumstances such that he is entitled
to qualified immunity with regard to Plaintiff's federal claim and to dismissal of
Plaintiff's state law claims of assault and battery. Plaintiff opposes the motion.

The court heard oral argument on Defendant's motion on December 23, 2014, at which time the court directed Plaintiff's attorney to submit a response to Defendant's statement of undisputed facts. Plaintiff's attorney submitted Plaintiff's response on January 2, 2015, at which time the court took the matter under advisement.

Plaintiff is represented by David C. Sleigh, Esq. Defendant is represented by Joseph A. Farnham, Esq. and Kevin J. Coyle, Esq.

I.     **Factual and Procedural Background.**

   A.     **Undisputed Facts.**

In the late evening of August 14-15, 2012, Border Patrol Agent Christopher Chamberlain was on duty traveling on Main Street in Newport, Vermont, when he observed an "SUV come through the stoplight," "then cross over all lanes of traffic," and drive straight towards him on his side of the road. (Doc. 26-3 at 1-2.) Agent Chamberlain stopped his cruiser to watch the vehicle approach, pass, and stop on Main Street near the railroad tracks. Agent Chamberlain turned his cruiser around, parked behind the already-stopped vehicle, and activated his cruiser's lights. He observed a woman, later identified as Plaintiff's wife, "walking around the front of the vehicle and get[ing] into the passenger seat." (Doc. 26-3 at 2.) Agent Chamberlain approached the driver's side and observed Plaintiff in the driver's seat. As Agent Chamberlain spoke with Plaintiff, he was joined by Officer Butler of the Newport City Police Department ("NCPD") and, minutes later, Defendant.[1]

Officer Butler spoke first with Plaintiff and requested his driver's license and proof of registration and insurance. In doing so, Officer Butler detected an odor of intoxicants emanating from Plaintiff and decided to commence a DUI investigation, with which Plaintiff fully cooperated. Officer Butler asked Plaintiff to perform field sobriety

---

[1] Officer Butler was on patrol that night and had driven past a vehicle parked on Main Street. At the time, he did not observe any occupants inside the vehicle. He drove to the causeway between Lake Memphremagog and the lake's "South Bay" and then returned to Main Street. As he did so, he saw a Border Patrol cruiser parked behind the vehicle, with the cruiser's lights activated, and he saw Plaintiff in the driver's seat and Laura Prive in the passenger's seat. He then stopped to render assistance.

tests and submit a preliminary breath test, all of which Plaintiff passed. During this time, Officer Butler described Plaintiff as "very, very calm." (Doc. 34 at 5, ¶ 17.)

Officer Butler then conferred with Agent Chamberlain, who informed him that he had seen a woman operating the vehicle as it passed his cruiser on Main Street. When confronted with this allegation, both Plaintiff and, his wife, Laura Prive, asserted that Plaintiff had been driving. Officer Butler then decided to commence a DUI investigation of Laura Prive. At approximately this point, the events are captured by videotape.[2]

As Ms. Prive stood next to the passenger door, Plaintiff asked why the officers were speaking to her. Plaintiff's tone of voice appears loud, confrontational, and agitated, even when considered in the light most favorable to him. After Ms. Prive appeared to speak to Plaintiff through the open passenger window, Officer Butler ordered her to step away from the vehicle. She complied and walked to the rear of the vehicle, stating, "I know I've had enough to drink. . . . Just give me the DWI." (Ex. H-1 at 00:09-00:15.) She explained to Officer Butler that Plaintiff had been driving and that they had been arguing. Officer Butler informed her that Agent Chamberlain saw her driving, to which she responded, "go ahead and charge me," but continued to insist that Plaintiff had been driving, had stopped during their argument, and had "jumped out" of the vehicle. (Ex. H-1 at 00:38.) When Officer Butler asked how much she had to drink that night, she admitted to having three drinks and that "I know I've had enough. I know I'm over the limit." (Ex. H-1 at 00:50-01:03.) When asked by Officer Butler if she would submit to a preliminary breath test, she agreed she would do so. Defendant then asked her if she was "going to refuse to do the dexterities," to which she responded: "I will do whatever the hell you want. He already said he was driving." (Ex. H-1 at 01:22-

---

[2] Where there is a discrepancy between the parties' versions of the facts and the videotape, the court has relied on the videotape. *See Scott v. Harris*, 550 U.S. 372, 397-80 & n.5 (2007) (directing that a court ruling on a motion for summary judgment must "allow the videotape to speak for itself" and that the court should not adopt a "version of the facts" that is "blatantly contradicted" by the videotape); *see also MacLeod v. Town of Brattleboro*, 2012 WL 1928656, at *4 (D. Vt. May 25, 2012) ("In assessing whether there are triable issues of fact, the court may rely on facts as depicted in an unaltered videotape and audio recording, even when such facts contradict those claimed by the nonmoving party."), *aff'd*, 548 F. App'x 6 (2d Cir. 2013).

01:34.)  As Defendant directed Laura Prive to stand in the street on "solid" ground in order to perform the dexterities, she stated to Defendant, "you don't like us."  (Ex. H-1 at 01:35.)

At this juncture, Plaintiff exited the driver's side of the vehicle and approached the officers.  He took approximately eight steps before stopping at the rear of his vehicle.  Laura Prive and the officers were standing in close proximity to the rear of the vehicle.  After Defendant issued one command to Plaintiff to get back in his vehicle, Ms. Prive responded, "no, he's staying out here," and Plaintiff responded: "No.  No.  I just told you guys I was driving the rig."  (Ex. H-1 at 01:40-01:45.)  Again, Plaintiff's tone of voice appeared loud and confrontational.  Defendant told Plaintiff: "I'm going to tell you one more time to get back in the vehicle."  (Ex. H-1 at 01:45.)  Plaintiff yelled: "I just told you I was driving the rig."  (Ex. H-1 at 01:46.)  Defendant ordered Plaintiff a third time to "get back in [the] vehicle," while Laura Prive twice stated, "Fabian get in."  (Ex. H-1 at 01:47-01:50.)

While ordering Plaintiff to get back in his vehicle, Defendant made "soft hand control contact with Plaintiff's chest," (Doc. 26-2 at 5, ¶ 26), depicted on the videotape as akin to a light "shove[]."  (Doc. 34 at 7, ¶ 26; *see also* Ex. H-2 at 00:18.)  After Defendant did so, Plaintiff "made contact with" Defendant with both hands.  (Doc. 26-2 at 5, ¶ 28; Doc. 34 at 7, ¶ 28.)  From the videotape, it appears as if Plaintiff attempted to push Defendant back with both of his hands.  As Defendant stepped toward Plaintiff, Plaintiff raised his right arm and pointed at Defendant, while yelling, "Don't touch me. Don't touch me."  (Ex. H-1 at 01:50; Ex. H-2 at 00:18-00:20.)

Defendant then pushed Plaintiff into the side of Plaintiff's vehicle and, holding Plaintiff's right wrist, moved Plaintiff away from it.  The four officers then grappled with Plaintiff, with one officer also attempting to control Laura Prive, who struck and pushed the officers while yelling obscenities at them.  During this time, Plaintiff stated, "That's f***ing harassment.  That's f***ing harassment.  That's harassment."  (Ex. H-2 at 00:20-00:25.)

4

As the officers attempted to physically control both Plaintiff and Ms. Prive, Defendant twice ordered Plaintiff: "Go down or you're going to be tased." (Doc. 26-2 at 5-6, ¶ 31; *see also* Ex. H-2 at 00:25-00:32.) Another officer also ordered, "Go down." (Ex. H-2 at 00:30.) Plaintiff did not comply. Almost immediately after Defendant's second command, Defendant tased Plaintiff in the back, and Plaintiff fell to the ground. As Plaintiff lie on the ground, Defendant ordered Plaintiff twice to put his hands behind his back. Approximately twelve to fourteen seconds elapsed between Defendant's first contact with Plaintiff and Defendant's deployment of his taser.

Laura Prive continued to scream and curse at the officers during this time period, telling the officers to get off of her, while Plaintiff repeatedly advised his wife not to continue this activity. Thereafter, one officer restrained Ms. Prive while two officers handcuffed Plaintiff. The officers were then able to bring Plaintiff to a standing position. Laura Prive continued to scream and curse at the officers, prompting Plaintiff to again ask her to stop. She responded, "Fabian, they're a\*\*holes," and he replied, "Don't worry about it." (Ex. H-1 at 03:10-03:15.) The officers replaced Plaintiff's eyeglasses on his face. Plaintiff stated: "Gosh guys." (Ex. H-1 at 03:20.) The officers then escorted Plaintiff, who remained handcuffed, to a cruiser.

The officers resumed their investigation of Laura Prive, who refused to perform field sobriety exercises, and when asked whether she would refuse to take a preliminary breath test, responded, "Yeah. F\*\*k you all." (Ex. H-1 at 04:18-04:20.) After being told that she was under arrest, Ms. Prive said she would take the tests, but Defendant told her it was too late. Defendant then handcuffed Ms. Prive, and Officer Butler called for a tow truck for the Prives' vehicle. Laura Prive was charged with Negligent Operation and participated in a court diversion program.

Plaintiff was subsequently charged with disorderly conduct, in violation of 13 V.S.A. § 1026, and impeding a public officer, in violation of 13 V.S.A. § 3001. All charges against Plaintiff were eventually dismissed.[3]

---

[3] After Plaintiff filed a motion to dismiss and the State failed to file a response to that motion, the state court judge presiding over Plaintiff's criminal case dismissed the charge of hindering a law

Following the incident in question, Plaintiff sought medical treatment, which he explained in his answer to Defendant's interrogatories as follows:

> Went to North Country Hospital, was knocked down, glasses were knocked off my face. Handcuffs were extremely tight, cutting off circulation on arm. Sprained near thumb area and scrapes on arm. Marks on wrist from handcuffs being too tight.

(Doc. 26-2 at 11, ¶ 75; *see also* Doc. 26-24.)

At the time of the incident, the NCPD had in effect a "Response to Resistance Policy" (the "Policy") that listed certain "Force Options." (Doc. 26-12.) Regarding "Soft Empty Hand Control," the Policy stated: "Officer's use of hands on the subject to direct the subject's movement; Techniques that have a low potential of injury to the subject." *Id.* Regarding "Electronic Control Devices," the Policy provided: "Where subject exhibits some level of active resistance/active aggression an officer may use an electronic control device to temporarily incapacitate the subject." *Id.* To determine "the appropriate level of response to a subject's resistance," the Policy directed an officer to consider: (1) "How serious is the offense the officer suspected at the time the particular force used?"; (2) "What was the physical threat to the officer or others?"; (3) "Was the subject actively resisting or attempting to evade arrest by flight?" *Id.*

In 2012, Defendant was certified as a full time law enforcement officer by the Vermont Criminal Justice Training Council and had received training at the Vermont Police Academy and the NCPD regarding the use of force. Defendant was also certified to carry and use the taser he deployed against Plaintiff, which was the Taser International X2 taser. This type of taser can be deployed in two different manners: "drive stun mode

---

enforcement officer on May 15, 2013, on the grounds that Plaintiff's behavior on the night in question did not indicate that he "intended to physically interfere with the Officers, nor did he actually do so," and thus the State had "failed to present sufficient evidence to defeat [Plaintiff's] motion to dismiss." (Doc. 29-4 at 1-2.) A day after the State filed a motion to continue the trial on the remaining charge of disorderly conduct, the state court judge dismissed that charge *sua sponte* on October 22, 2013, noting that the charge is "one of the least serious in the Vermont Criminal [C]ode" and that no one was injured during the incident and thus concluding that the "year-old misdemeanor appear[ed] to be appropriating resources beyond or out of [proportion] to its actual w[e]ight" in the "resource-poor environment that is the Vermont [c]riminal justice system." (Doc. 29-2 at 61.)

where the device is held against the subject's person, without skin penetration and without a set duration of electrical charge, or tase mode, which involves probes that are shot into the subject's body, with a duration of five seconds of electrical charge." (Doc. 26-2 at 6, ¶ 34) (internal quotation marks omitted). "Drive stun mode is intended to cause pain without incapacitating the subject" and "causes significant localized pain in the area touched by the device but does not have a significant effect on the subject's central nervous system." (Doc. 26-2 at 6, ¶¶ 35, 36.)

The tasing of Plaintiff occurred in drive stun mode. Senior Officer Royce Lancaster of the NCPD, who is certified and trained in the use of tasers and is the NCPD's taser instructor, reviewed the "function, electrical charge and duration" of the deployment of the taser in this case and estimated the drive stun applied to Plaintiff was "a single event of approximately 1.3 seconds." (Doc. 26-2 at 9-11, ¶¶ 66-74.)

### B.    Disputed Facts.

Agent Chamberlain testified that he saw Laura Prive operating the Prives' vehicle when it passed his cruiser on Main Street and that the Prives' vehicle stopped on its own on Main Street "pretty much right on the railroad tracks." (Doc. 26-3 at 2.) After the Prives' vehicle was stopped, Agent Chamberlain asserts that he saw the female who had been operating the vehicle "walking around the front of the vehicle and get into the passenger seat." (Doc. 26-3 at 2.)

Plaintiff and Laura Prive assert that Plaintiff was the "sole operator of the vehicle on the night in question"; that Ms. Prive "never operated the vehicle that evening"; and that the vehicle stopped before, rather than on, the railroad tracks. (Doc. 34 at 2, ¶¶ 2, 5.) They also assert that Agent Chamberlain did not see Laura Prive exiting the driver's seat and getting in the passenger's seat. Instead, Plaintiff pulled the vehicle over, stopped it, and started walking home because he and his wife were having a "minor argument relating to leaving Jasper's Tavern prior to the anticipated arrival there of some friends" and that Agent Chamberlain actually saw Laura Prive "returning to the passenger seat after she left the vehicle to get [Plaintiff] back into the truck." (Doc. 34 at 2, ¶ 5.)

Prior to the incident in question, Defendant asserts that he was "familiar" with Plaintiff and "was aware of other incidents involving Plaintiff and other officers from the [NCPD] in which Plaintiff was alleged to have been violent." (Doc. 26-2 at 3, ¶ 12; Doc. 26-6 at 2, ¶¶ 6-7.) Defendant further asserts that he believed "Plaintiff might be prone to acts of violence and that he might resist efforts to take him into custody, if the circumstances rose to that level." (Doc. 26-2 at 3, ¶ 14; Doc. 26-6 at 2, ¶ 8.) Defendant claims his opinions of Plaintiff are based on information he received from other NCPD officers and from information in the Computer Aided Dispatch system ("CAD").[4]

Plaintiff does not challenge that he "was alleged to have been involved in incidents of tumult" prior to August 2012, but he notes that none of these prior incidents involved allegations that Plaintiff was tumultuous towards or violent with police officers. (Doc. 34 at 3-4, ¶¶ 12, 14.) Plaintiff points out that none of his prior criminal cases "involved assaultive behavior towards the police" and that most of his prior cases "stemmed from an ongoing property dispute with his neighbor." (Doc. 34 at 4, ¶ 14.)

Defendant contends that when Plaintiff exited his vehicle it "appeared" that he was going to "come after [Officer] Butler and try and intervene into the investigation." (Doc. 26-2 at 8, ¶ 54; Doc. 26-14 at 1.) Defendant and Officer Butler testified that they both observed that Plaintiff was agitated and aggressive, and Defendant was concerned for Officer Butler's safety based on Plaintiff's "aggressive tone." (Doc. 26-2 at 8, ¶ 55.) Officer Butler "perceived Plaintiff coming toward him, trying to impede his investigation with Plaintiff's wife" and "felt threatened because Plaintiff was very agitated." (Doc. 26-2 at 8-9, ¶¶ 57-58.) After Defendant made initial physical contact with Plaintiff, Defendant believed that Plaintiff raised his hands in response and made "contact" with Defendant. (Doc. 26-2 at 5, ¶ 28.) As Defendant "attempted arm/hand controls on

---

[4] While Defendant did not submit records from the CAD system regarding the "information" he received concerning Plaintiff, (Doc. 26-6 at 2, ¶¶ 6, 8), it is undisputed that prior to the incident in question Plaintiff had pled guilty in 2010 to one count of unlawful mischief and one count of disorderly conduct stemming from an incident on December 28, 2009, and had pled nolo contendere in 2008 to one count of simple assault-mutual affray stemming from an incident on August 3, 2007. (*See* Doc. 29-2 at 43, 47; Doc. 29-10 at 2-3.)

Plaintiff," Plaintiff "actively resist[ed]" Defendant and the other officers. (Doc. 26-2 at 5, ¶¶ 28-29.)

Plaintiff challenges the impressions and subjective beliefs of Defendant and Officer Butler, arguing that the videotape does not depict that Plaintiff "was going to go after" Officer Butler or that Plaintiff used an "aggressive" tone, was "aggressive" and "agitated," or "threatened" the officers. (Doc. 34 at 10-11, ¶¶ 54-58.) Plaintiff further contends that he did not willfully and consciously raise his hands, but rather that he engaged in "a reflexive action consistent with having been shoved" and that he thereafter did not "actively resist" the officers. (Doc. 34 at 7, ¶¶ 28-29.)

## II.    Conclusions of Law and Analysis.

### A.    Standard of Review.

Summary judgment must be granted when the record shows there is no genuine dispute as to any material fact and the moving party is entitled to judgment as a matter of law. *See* Fed. R. Civ. P. 56(a). "A fact is 'material' . . . when it 'might affect the outcome of the suit under the governing law,'" and "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Jeffreys v. City of New York*, 426 F.3d 549, 553 (2d Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("Factual disputes that are irrelevant or unnecessary will not be counted.")). "If, as to the issue on which summary judgment is sought, there is any evidence in the record from which a reasonable inference could be drawn in favor of the opposing party, summary judgment is improper." *Sec. Ins. Co. of Hartford v. Old Dominion Freight Line Inc.*, 391 F.3d 77, 82-83 (2d Cir. 2004) (internal quotation marks omitted).

The moving party "always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). "When the moving party has carried its burden under Rule 56(c), its opponent

9

must do more than simply show that there is some metaphysical doubt as to the material facts. [Rather], the nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586-87 (1986) (internal quotation marks, citations, and footnotes omitted).

"The trial court's function in deciding such a motion is not to weigh the evidence or resolve issues of fact, but to decide instead whether, after resolving all ambiguities and drawing all inferences in favor of the non-moving party, a rational juror could find in favor of that party." *Pinto v. Allstate Ins. Co.*, 221 F.3d 394, 398 (2d Cir. 2000); *see also McClellan v. Smith*, 439 F.3d 137, 148 (2d Cir. 2006) ("'Resolutions of credibility conflicts and choices between conflicting versions of the facts are matters for the jury, not for the court on summary judgment.'") (quoting *United States v. Rem*, 38 F.3d 634, 644 (2d Cir. 1994)).

### B.  Whether Disputed Facts Are Material and Prevent Summary Judgment in Defendant's Favor.

Because of the conflicting testimony of Agent Chamberlain, Plaintiff, and Laura Prive, there are disputed issues of fact regarding who drove the Prives' vehicle and where the vehicle stopped. However, Plaintiff has not challenged the legality of the initial stop or the DUI investigation and instead challenges only his subsequent arrest and prosecution. These disputed facts are therefore not material to Plaintiff's claims. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986) ("As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment.").

There is also a factual dispute regarding Defendant's knowledge of Plaintiff's prior involvement in crimes of violence and whether Defendant reasonably believed Plaintiff was prone to violence towards police officers and was preparing to assault Officer Butler or otherwise physically attack the officers. Because the videotape indisputably reveals that Defendant was the physical aggressor in the altercation, and

further indisputably reveals Plaintiff refused to heed law enforcement's commands, it is immaterial whether Defendant reasonably believed Plaintiff was prone to violence against police officers. *See Graham*, 490 U.S. at 396 ("An officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional.").

Resolution of whether Defendant had probable cause or arguable probable to arrest Plaintiff, and whether Defendant employed reasonable force in effecting that arrest, do not require consideration of the disputed facts. Summary judgment thus remains available if Defendant has established that he is entitled to judgment as a matter of law. *See Roe v. City of Waterbury*, 542 F.3d 31, 35-36 (2d Cir. 2008) (directing that once the moving party demonstrates that there are no genuine issues of material fact, which are facts that "might affect the outcome of the suit under the governing law," the moving party must also demonstrate entitlement to judgment as a matter of the law) (internal quotation marks omitted); *see also Anderson*, 477 U.S. at 248 ("Factual disputes that are irrelevant or unnecessary will not be counted.").

### C. Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Claims of False Arrest (Count One) and False Imprisonment (Count Four).

Defendant argues that he is entitled to summary judgment in his favor because he had probable cause to arrest Plaintiff. "Probable cause is a complete defense to a constitutional claim of false arrest and false imprisonment." *Betts v. Shearman*, 751 F.3d 78, 82 (2d Cir. 2014) (citing *Singer v. Fulton Cnty. Sheriff*, 63 F.3d 110, 118 (2d Cir. 1995); *Zanghi v. Inc. Vill. of Old Brookville*, 752 F.2d 42, 45 (2d Cir. 1985)). This defense applies whether the "action is brought under state law or under § 1983." *Gonzalez v. City of Schenectady*, 728 F.3d 149, 155 (2d Cir. 2013) (internal quotation marks omitted); *see also Kent v. Katz*, 327 F. Supp. 2d 302, 306 (D. Vt. 2004) (noting that a federal and state (Vermont) claim of unlawful arrest "must fail if there was probable cause for the arrest"), *aff'd*, 125 F. App'x 334 (2d Cir. 2005).

"Probable cause exists when the facts and circumstances known to an officer are sufficient to lead a reasonable person to believe that a crime was committed and that the suspect committed it." *State v. Chicoine*, 2007 VT 43, ¶ 8, 181 Vt. 632, 633, 928 A.2d 484, 487; *accord Amore v. Novarro*, 624 F.3d 522, 536 (2d Cir. 2010). The existence of probable cause is an objective inquiry that "'depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest.'" *Jaegly v. Couch*, 439 F.3d 149, 154 (2d Cir. 2006) (quoting *Devenpeck v. Alford*, 543 U.S. 146, 152-53 (2004) (directing that "the circumstances, viewed objectively, [must] justify" the arrest, which "depends upon the reasonable conclusion to be drawn from the facts known to the arresting officer at the time of the arrest").

In the absence of actual probable cause, an officer may be entitled to assert qualified immunity based on "arguable probable cause." *See Ackerson v. City of White Plains*, 702 F.3d 15, 21 (2d Cir. 2012). Arguable probable cause "exists if either (a) it was objectively reasonable for the officer to believe that probable cause existed, or (b) officers of reasonable competence could disagree on whether the probable cause test was met." *Zalaski v. City of Hartford*, 723 F.3d 382, 390 (2d Cir. 2013) (internal quotation marks omitted). In undertaking this analysis, "judges should be cautious about second-guessing a police officer's assessment, made on the scene," as opposed to examining the incident in question "[w]ith the benefit of hindsight and calm deliberation." *Ryburn v. Huff*, 132 S. Ct. 987, 991-92 (2012); *accord Boyd v. City of New York*, 336 F.3d 72, 76 (2d Cir. 2003).

### 1.   Disorderly Conduct.

Defendant contends he had probable cause, or arguable probable cause, to arrest Plaintiff for disorderly conduct because Plaintiff (1) "engage[d] in fighting or in violent, tumultuous, or threatening behavior," or (2) "ma[de] unreasonable noise," in violation of 13 V.S.A. § 1026(a)(1)-(2). Plaintiff counters that the videotape does not depict his behavior as violent, tumultuous, reckless, assaultive, or unlawfully non-compliant. He also points out that a state court judge ultimately dismissed this charge.

"Vermont's disorderly conduct statute provides a common intent element: 'with intent to cause public inconvenience, or annoyance or recklessly creating a risk thereof,'" and "then contains five alternative specifications of the criminal conduct." *State v. Albarelli*, 2011 VT 24, ¶ 9, 189 Vt. 293, 298, 19 A.3d 130, 134. Generally, "the word public refers to the place the . . . behavior occurred," and "[p]ublic is defined as a place 'open to common or general use.'" *State v. Lund*, 475 A.2d 1055, 1060-61 (Vt. 1984), (quoting *Webster's New International Dictionary* at 2005 (1961)), *overruled on other grounds by State v. Dumont*, 499 A.2d 787 (Vt. 1985).

"The term 'violent' contemplates a wide range of inappropriate behavior," including "behavior that could be characterized as furious, severe, vehement, extreme, [and] intense," as well as "unjust or improper force." *State v. O'Connell*, 510 A.2d 167, 171 (Vt. 1986). Tumultuous behavior "may refer to the commotion and agitation of a large crowd" or a "violent outburst," and, while "[a] crowd of people is not the essence of a tumult," three people in "privy" to an "outburst" would "satisfy any 'crowd' requirement." *Lund*, 475 A.2d at 1060. "Threatening behavior is behavior that communicates the requisite intent." *State v. Cole*, 554 A.2d 253, 255 (Vt. 1988) ("[T]he word 'threaten' includes some element of volition. A threat is a communicated intent to inflict harm on person or property.").

As Plaintiff's vehicle was stopped on a "public roadway" during a DUI investigation, there is no dispute that Plaintiff's conduct occurred in "public" for purposes of section 1026. *Cf. Cole*, 554 A.2d at 255 (concluding "public roadway" met "statutory standard" for "public" because it is "an area that is clearly open to general and common use" and that defendant's "resistance to arrest by attempting to take the flashlight" of the arresting officer was sufficient under the statute). Whether Plaintiff's conduct rose to the level of violent, tumultuous, or threatening behavior, or whether Plaintiff made unreasonable noise, presents a closer question.

In the light most favorable to Plaintiff, Defendant initiated a physical confrontation in response to Plaintiff's exiting his vehicle, approaching Defendant, and questioning Defendant's activities in a loud and confrontational manner. Thereafter,

Plaintiff was non-compliant in response to three unequivocal commands ordering him back to his vehicle. Following Defendant's initial physical contact with Plaintiff, which Plaintiff resisted by responding with his own hands, Plaintiff failed to respond to several orders to get down on the ground. Plaintiff briefly struggled with the officers as they attempted to force him to the ground prior to the deployment of the taser. In the light most favorable to Plaintiff, Defendant reacted quickly to Plaintiff's verbally confrontational behavior without waiting to determine whether Plaintiff would actually become physically tumultuous, violent, or threatening. Thereafter, the videotape clearly depicts Plaintiff engaging in some level of physical resistance towards Defendant and refusing to submit to his arguably lawful commands. *Cf. State v. Amsden*, 2013 VT 51, ¶¶ 10, 19, 194 Vt. 128, 134, 138, 75 A.3d 612, 616, 619 (noting also that "[a] defendant may be found guilty of disorderly conduct based on behavior that occurs during an arrest").

Even when examined in the light most favorable to Plaintiff, "officers of reasonable competence could disagree on whether the probable cause test was met," *Zalaski*, 723 F.3d at 390 (internal quotation marks omitted), which "'requires only a probability or substantial chance of criminal activity, not an actual showing of such activity.'" *United States v. Bakhtiari*, 913 F.2d 1053, 1062 (2d Cir. 1990) (quoting *Illinois v. Gates*, 462 U.S. 213, 244 n.13 (1983)). Similarly, officers of reasonable competence could disagree regarding whether Plaintiff's loud and agitated yelling at the officers and his intervention in the DUI investigation of his wife constituted unreasonable noise in the circumstances. *See State v. McDermott*, 373 A.2d 510, 514 (Vt. 1977) (explaining that "unreasonable noise" should be "gauged by the totality of the circumstances at the time the act is committed"). Because there was arguable probable cause to arrest Plaintiff for disorderly conduct, Defendant is entitled to qualified immunity with regard to Plaintiff's federal and state law claims of false arrest and false imprisonment.

### 2.    Hindering a Law Enforcement Officer.

Defendant contends that he also had probable cause, or arguable probable cause, to arrest Plaintiff for hindering a law enforcement officer, in violation of 13 V.S.A. § 3001. Plaintiff, in contrast, asserts that he did nothing to physically interfere with the investigation of his wife.  Plaintiff notes that a state court judge granted his motion to dismiss this charge, (Doc. 29 at 4), finding that "[n]othing" concerning Plaintiff's behavior indicated that Plaintiff "intended to physically interfere with the Officers, nor did he actually do so." (Doc. 29-4 at 2.)  The state court judge ultimately concluded that Plaintiff's case was "[m]uch like" the case in *State v. Stone*, 756 A.2d 785 (Vt. 2000), in that the prosecution in Plaintiff's case similarly "failed to demonstrate" that Plaintiff "intended to physically interfere" with the law enforcement officers.  (Doc. 29-4 at 2.)

Section 3001(a) makes it a crime to "hinder[]" a law enforcement officer "acting under the authority of this state or any subdivision thereof." 13 V.S.A. § 3001(a). The Vermont Supreme Court has "defined 'hinder' as 'to slow down or to make more difficult someone's progress towards accomplishing an objective; to delay, or impede or interfere with that person's progress.'" *Stone*, 756 A.2d at 788 (quoting *State v. Oren*, 647 A.2d 1009, 1011 (Vt. 1994)).  "[T]he interference 'must be action that a defendant does not have the legal right to take.'" *Stone*, 756 A.2d at 788 (quoting *Oren*, 647 A.2d at 1011). In *Stone*,

> the defendant immediately got out of the car and walked towards the rear of the vehicle in a quick and determined manner.  She was carrying an object that turned out to be her purse.  The officer ordered her to return to the driver's seat, but she did not comply and continued walking.  The officer then left the passenger side of the car and confronted defendant along the driver's side.  He repeatedly ordered defendant to get back in the car until he had apprehended [her husband], but she refused to comply and attempted to go either around or through the officer.

*Id.* at 786.  The *Stone* court held it was not a crime to either fail to follow the officer's commands or to try "to go through or around the officer where he confronted her" because the defendant "had a right to walk away from the vehicle." *Id.* at 790.  A

defendant violates section 3001 only if the defendant "intended to physically interfere with the arrest of [the other person at the scene]." *Id.*

In this case, the videotape reveals that Plaintiff walked towards the officers, stopped, and then yelled at them to cease investigating his wife for driving under the influence. In doing so, he failed to cooperate with repeated commands to return to his vehicle. Plaintiff's voice was loud and confrontational, and he stood in close proximity to the officers. Plaintiff's conduct caused law enforcement to momentarily suspend their DUI investigation of Plaintiff's wife.

Although a close question under *Stone*, "[q]ualified immunity gives government officials breathing room to make reasonable but mistaken judgments, and protects all but the plainly incompetent or those who knowingly violate the law." *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1244 (2012) (internal quotation marks omitted); *see also Sira v. Morton*, 380 F.3d 57, 81 (2d Cir. 2004) ("[T]he qualified immunity standard gives ample room for mistaken judgments.") (internal quotation marks omitted). "The protection of qualified immunity applies regardless of whether the government official's error is a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (internal quotation marks omitted). When an officer is "confronted with ambiguities of fact and law," the officer is entitled to qualified immunity based on a "reasonable" interpretation of whether a suspect's "ambiguous behavior" violated a criminal statute and when "no clearly established law would [have made] it clear to a reasonable officer" that the arrest was without probable cause. *Garcia v. Does*, 2015 WL 737758, at *9 (2d Cir. Feb. 23, 2015) (internal quotation marks and citations omitted).

Accordingly, it was "objectively reasonable" for Defendant to believe that "probable cause existed" to arrest and charge Plaintiff for hindering a law enforcement officer. *Zalaski*, 723 F.3d at 389-90 (directing that the relevant "inquiry is not how courts or lawyers might have understood the state of the law at the time of the challenged conduct" but whether "it would be clear to a *reasonable officer* that his conduct was unlawful in the situation he confronted" because, for example, his "conduct was not

16

objectively unreasonable in light of existing law") (internal quotation marks and citations omitted); *see also Messerschmidt*, 132 S. Ct. at 1245 (directing a court to examine "the objective legal reasonableness of the action" of the officer) (internal quotation marks omitted).

Because there was arguable probable cause to arrest Plaintiff for hindering a law enforcement officer, Defendant is entitled to qualified immunity. Correspondingly, Defendant has therefore established that he is entitled to judgment as a matter of law in his favor on Plaintiff's federal and state law claims of false arrest and false imprisonment. The court therefore GRANTS Defendant's motion for summary judgment on Counts One and Four.

### D.   Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Claim of Malicious Prosecution (Count Five).

In Count Five, Plaintiff alleges that Defendant "knowingly and maliciously initiated a prosecution against Plaintiff without probable cause by knowingly and willfully providing the Orleans County State's Attorney false information" and that Defendant "knowingly and falsely swore that Plaintiff had engaged in criminal conduct, including allegations of felonious impeding a police officer and disorderly conduct." (Doc. 5 at 4, 6, ¶¶ 47, 59.) Defendant counters that probable cause, or arguable probable cause, existed with respect to both charges. To prevail on a state law claim of malicious prosecution, Plaintiff must demonstrate that Defendant "instituted a proceeding against [him] without probable cause," as well as that Defendant "did so with malice, that the proceeding terminated in [Plaintiff's] favor, and that [Plaintiff] suffered damages as a result of that proceeding." *Siliski v. Allstate Ins. Co.*, 811 A.2d 148, 151 (Vt. 2002). While "malicious prosecution claims are routinely brought against state and local prosecutors, law enforcement officers, and investigators for their actions in connection with the filing of criminal proceedings," *Czechorowski v. State*, 2005 VT 40, ¶ 30, 178 Vt. 524, 533, 872 A.2d 883, 895-96, the tort "is not favored," and the Vermont Supreme Court has been "reluctant to use it to chill legitimate law enforcement activities." *Cook v.*

*Nelson*, 712 A.2d 382, 385 (Vt. 1998) (internal citations omitted); *accord Anello v. Vinci*, 458 A.2d 1117, 1120 (Vt. 1983).

Here, Defendant submitted an affidavit in support of probable cause for the offenses of disorderly conduct and hindering a law enforcement officer.  (Doc. 26-7 at 1-2.)  Once Defendant reasonably believed probable cause existed for Plaintiff's arrest and prosecution, he was required "to apprehend those suspected of wrongdoing, and not to finally determine guilt through a weighing of the evidence." *Krause v. Bennett*, 887 F.2d 362, 372 (2d Cir. 1989) ("Once officers possess facts sufficient to establish probable cause, they are neither required nor allowed to sit as prosecutor, judge or jury."); *see also Ricciuti v. N.Y.C. Transit Auth.*, 124 F.3d 123, 128 (2d Cir. 1997) (noting that an officer is not required "to explore and eliminate every theoretically plausible claim of innocence before making an arrest" if the officer "has a reasonable basis for believing there is probable cause").

Plaintiff makes no claims Defendant engaged in the "mishandling or suppression of exculpatory evidence," *Russo v. City of Bridgeport*, 479 F.3d 196, 205 (2d Cir. 2007) (internal quotation marks omitted), nor claims that Defendant became aware of some "intervening fact" that would have established the "groundless nature" of the charges for which he arrested Plaintiff. *Kinzer v. Jackson*, 316 F.3d 139, 143-44 (2d Cir. 2003) (explaining that "the probable cause that existed at the time of [an] arrest [can be] nullified by information establishing [the suspect's] innocence") (internal quotation marks and citations omitted).

A state court judge presiding over Plaintiff's criminal case initially found probable cause existed with regard to the charges of disorderly conduct and hindering a law enforcement officer.  (Doc. 29-2 at 56.)  "The mere fact that a criminal tribunal found probable cause normally provides a presumption that probable cause existed" in the earlier prosecution, and this presumption "is rebuttable only if a plaintiff can demonstrate that the earlier finding of probable cause was based on misleading, fabricated, or otherwise improper evidence." *Lay v. Pettengill*, 2011 VT 127, ¶ 22, 191 Vt. 141, 153, 38 A.3d 1139, 1147 (collecting state cases in accord).  As a result, in order to prevail

upon a state law claim of "malicious" or "wrongful" prosecution, "[t]here must be a plausible suggestion that the finding of probable cause would not have been reached were it not for some irregularity or impropriety." *Id.* at ¶¶ 22, 31, 191 Vt. at 153, 159, 38 A.3d at 1147, 1151. While Plaintiff alleges in the Complaint that Defendant "knowingly and falsely swore that Plaintiff had engaged in criminal conduct," (Doc. 5 at 4, ¶ 47), Plaintiff provides no evidence to support this allegation. *Lay*, 2011 VT 127, ¶ 22, 191 Vt. at 153, 38 A.3d at 1147. He therefore cannot avoid summary judgment on this basis. *See Niagara Mohawk Power Corp. v. Jones Chem. Inc.*, 315 F.3d 171, 175 (2d Cir. 2003) ("Conclusory allegations, conjecture, and speculation . . . are insufficient to create a genuine issue of fact. The mere existence of a scintilla of evidence supporting the non-movant's case is also insufficient to defeat summary judgment.") (internal quotation marks and citations omitted).

"Given that a lack of probable cause is a necessary element for malicious prosecution," the existence of probable cause defeats this claim. *Lay*, 2011 VT 127, ¶ 31, 191 Vt. at 159, 38 A.3d at 1151; *see also Stansbury v. Wertman*, 721 F.3d 84, 94-95 (2d Cir. 2013) ("Because lack of probable cause is an element of a malicious prosecution claim, the existence of probable cause is a complete defense to a claim of malicious prosecution.") (internal quotation marks omitted). "Even in the absence of probable cause, a police officer is entitled to qualified immunity" for a claim of malicious prosecution, which "turn[s] on whether the [officer's] probable cause determination was objectively reasonable—that is, whether there was 'arguable' probable cause" for the charge. *Betts*, 751 F.3d at 82-83; *accord Droz v. McCadden*, 580 F.3d 106, 109 (2d Cir. 2009) (holding officer entitled to qualified immunity on malicious prosecution claim). Similarly, under Vermont law, a law enforcement officer is entitled to qualified immunity for a state tort law claim of malicious prosecution if the officer's "determination that there was probable cause . . . , although erroneous, was objectively reasonable." *Cook*, 712 A.2d at 385.

In this case, because probable cause or arguable probable cause existed with regard to the state charges filed against Plaintiff, Defendant is entitled to qualified

immunity and judgment as a matter of law in his favor on Plaintiff's state law claim of malicious prosecution. The court therefore GRANTS Defendant's motion for summary judgment on Count Five.

### E.    Whether Defendant Is Entitled to Summary Judgment on Plaintiff's Claim of Excessive Force (Count One).

A claim of excessive force "is governed by the Fourth Amendment's 'reasonableness' standard." *Plumhoff v. Rickard*, 134 S. Ct. 2012, 2020 (2014). Under the Fourth Amendment, an officer's "right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it." *Graham v. Connor*, 490 U.S. 386, 396 (1989). The "proper application" of the reasonableness inquiry "requires careful attention to the facts and circumstances of each particular case, including the severity of the crime at issue, whether the suspect poses an immediate threat to the safety of the officers or others, and whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* at 396. In addition to considering the seriousness of the crime under investigation and the magnitude of the governmental interests at stake, the court may also examine, as part of the totality of the circumstances, "whether there were exigent circumstances, whether the use of less force was feasible and prudent, and whether the officer took reasonable steps to minimize the use of force and any injury resulting from that force." *MacLeod v. Town of Brattleboro*, 2012 WL 1928656, at *5 (D. Vt. May 25, 2012), *aff'd*, 548 F. App'x 6 (2d Cir. 2013); *see Jones v. Parmley*, 465 F.3d 46, 61 (2d Cir. 2006) (directing courts to "consider the facts and circumstances of each particular case").

The test is an objective one, and the officer's intent and motivations are not dispositive. *See Graham*, 490 U.S. at 396; *see also Lennon v. Miller*, 66 F.3d 416, 425 (2d Cir. 1995) ("[T]he question for the purposes of qualified immunity is whether a reasonable officer could have believed that the use of force alleged was objectively reasonable in light of the circumstances.") (internal quotation marks omitted). "In order to establish that the use of force to effect an arrest was unreasonable, [Plaintiff] must establish that the government interests at stake were outweighed by the 'nature and

quality of the intrusion on [plaintiffs'] Fourth Amendment interests.'" *Amnesty Am. v. Town of W. Hartford*, 361 F.3d 113, 123 (2d Cir. 2004) (quoting *Graham*, 490 U.S. at 396).

When the Prives' vehicle was stopped by law enforcement, the initial crime under investigation was driving under the influence, which had the potential to endanger public safety and cause serious bodily injury or death to another person or persons on the highway. The crime was therefore a serious one that warranted immediate investigation to prevent further impaired driving and because evidence of the crime was likely to dissipate over time. Agent Chamberlain's belief that he had seen Laura Prive driving raised the possibility that Ms. Prive might resume operation of the vehicle in the absence of investigation.

As the officers focused their investigation on Laura Prive, Plaintiff exited his vehicle and asserted that he had been driving. His proximity to the officers, his agitated, confrontational tone, and his refusal to return to his vehicle despite repeated commands to do so effectively forced the officers to deal with him rather than investigating his wife. In such circumstances, it was objectively reasonable for Defendant to believe that probable cause existed regarding an additional, and not trivial, crime—hindering a law enforcement officer.

The governmental interests at stake in this case included not only protection of the public on a public highway, but also ensuring the safety of the officers and the Prives during an evening incident in which Laura Prive was admittedly intoxicated, confrontational, and ultimately physically assaultive. Law enforcement officers' attempts to investigate Ms. Prive were indisputably hampered by Plaintiff's efforts to intervene on his wife's behalf. Moreover, during the physical confrontation with Plaintiff, Laura Prive repeated yelled at and physically confronted the law enforcement officers thereby imperiling her own and the officers' safety. *See Tracy v. Freshwater*, 623 F.3d 90, 96 (2d Cir. 2010) (considering safety of officers and others in excessive force analysis).

When Plaintiff refused to obey repeated commands to return to his vehicle and get down on the ground, Defendant made physical contact with Plaintiff first with his hands

and then with his taser. Courts have found that "noncompliance with police orders alone was sufficient to justify a show and use of some level of force." *MacLeod*, 2012 WL 1928656, at \*7 & n.5 (collecting cases); *see also Towsley v. Frank*, 2010 WL 5394837, at \*7-10 (D. Vt. Dec. 28, 2010) (finding that an officer's initial tasing of a suspect who, *inter alia*, failed to comply with numerous direct orders to submit to arrest, was reasonable under the circumstances).[5] Thereafter, Plaintiff remained non-compliant and Laura Prive was screaming and cursing at the officers and attempting to push and strike them. As a result, the officers were dealing with more than one non-compliant individual, and the level of aggression in the encounter was escalating.

Because "hands on" contact posed a risk of injury to both the officers and Plaintiff, the use of the taser was a "reasonable step[] to minimize" the continued use of "actual," "hands on" force. *MacLeod*, 2012 WL 1928656, at \*7; *see also McKenney v. Harrison*, 635 F.3d 354, 360 (8th Cir. 2011) (concluding a single taser shock was not an unreasonable use of force when, *inter alia*, the officer considered that an "alternative of attempting to subdue" the suspect by "tackling him posed a risk to the safety of the officer and did not ensure a successful arrest"); *Towsley*, 2010 WL 5394837, at \*8 (evaluating the relative risks of injury of going "hands on" with a combative subject as opposed to using a taser to place the subject under arrest).

It is undisputed that Plaintiff was briefly warned, "Go down or you're going to be tased." (Doc. 26-2 at 5-6, ¶ 31; *see also* Ex. H-2 at 00:25-00:32). *See MacLeod*, 2012 WL 1928656, at \*7 (noting that an officer "offered Plaintiff yet another albeit brief opportunity to comply with police commands in response to a lesser show of force" and that "Plaintiff remained noncompliant"); *see also Crowell v. Kirkpatrick*, 400 F. App'x at

---

[5] *See also Huertas v. Ivanko*, 2013 WL 1193187, at \*20 (D. Conn. Mar. 25, 2013) (concluding a push "to physically coerce" a suspect to move in the direction the officers had previously commanded was a reasonable response to the suspect's "repeated noncompliance"); *Brown v. Gilmore*, 278 F.3d 362, 369 (4th Cir. 2002) (concluding handcuffing and dragging suspect from scene to police cruiser was a reasonable use of force when the suspect "deliberately refused to comply with a request to move her car" and also noting it was "not unreasonable for the officers to believe that a suspect who had already disobeyed one direct order would balk at being arrested").

592, 595 (2d Cir. 2010) (concluding use of taser to effect arrests reasonable when officers warned they would use a taser and so plaintiffs had "a last opportunity" to comply with orders to leave the premises); *Gordon v. Cnty. of Onondaga*, 2014 WL 6078426, at *6 (N.D.N.Y. Nov. 13, 2014) (concluding use of taser reasonable when officer "repeatedly warned" he would use the taser to subdue the suspect and the suspect "disregarded those warnings"). Plaintiff nonetheless refused to obey at least two commands to lay on the ground before the taser was deployed. *See Hagans v. Franklin Cnty. Sheriff's Office*, 695 F.3d 505, 509 (6th Cir. 2012) (explaining courts have generally found the use of a taser to effect an arrest to be excessive only when the suspect was "compliant or had stopped resisting") (collecting circuit cases); *Draper v. Reynolds*, 369 F.3d 1270, 1278 (11th Cir. 2004) (concluding use of taser to effect arrest "was reasonably proportionate to the difficult, tense and uncertain situation that [the officer] faced in this traffic stop" because the plaintiff was "hostile, belligerent, and uncooperative," "accused" the officer of "harassing" plaintiff, repeatedly yelled, and refused to comply with verbal orders); *see also Gomez v. Vill. of Sleepy Hollow*, 2011 WL 2652450, at *11 (S.D.N.Y. July 6, 2011) (concluding the use of a taser on a suspect who did not obey a command and who appeared to grab and wrestle with the officer "was reasonable as it was a proportional response to the uncertainty and volatility of the situation").

Finally, although the use of the taser on Plaintiff was "a 'serious intrusion into the core of the interests protected by the Fourth Amendment,'" *MacLeod*, 2012 WL 1928656, at *7 (quoting *Mattos v. Agarano*, 590 F.3d 1082, 1087 (9th Cir. 2010)), Defendant's deployment of the taser in drive-stun mode for a matter of seconds, which "cause[d] significant localized pain" without "incapacitating the subject," (Doc. 26-2 at 6, ¶¶ 35, 36), and which caused neither serious nor permanent injury, was not unreasonable. *See Crowell*, 400 F. App'x at 595 (noting drive-stun mode "typically causes temporary, if significant, pain and no permanent injury").

Examining the facts and circumstances of this case "judged from the perspective of a reasonable officer on the scene," *Graham*, 490 U.S. at 396, and in the light most favorable to Plaintiff, Defendant's use of force was an objectively reasonable response to

the rapidly escalating confrontation. *See Brosseau v. Haugen*, 543 U.S. 194, 198-99 (2004) (directing "that use of force is contrary to the Fourth Amendment if it is excessive [only] under objective standards of reasonableness") (internal quotation marks omitted). The court therefore GRANTS Defendant's motion for summary judgment on Count One based upon qualified immunity.

**F.      Whether Defendant Is Entitled to Summary Judgment on Plaintiff's State Law Claim of Assault and Battery (Count Three).**

Under Vermont law, "'[a] police officer is not liable for assault and battery based upon the officer's lawful arrest of a person, where there was no use of excessive force, unreasonable contact, or the threat of unreasonable contact by the officer.'" *Crowell v. Kirkpatrick*, 667 F. Supp. 2d 391, 417 (D. Vt. 2009), *aff'd*, 400 F. App'x 592 (2d Cir. 2010) (quoting 6 Am.Jur.2d *Assault and Battery* § 98 (2009)).  In the absence of excessive force, Defendant is therefore entitled to judgment as a matter of law in his favor regarding Plaintiff's state law claims of assault and battery.  The court GRANTS Defendant's motion for summary judgment on Count Three.

**G.      Whether Defendant Is Entitled to Summary Judgment on Plaintiff's State Law Claim of Intentional Infliction of Emotional Distress (Count Two).**

"To avoid summary judgment on a claim for [intentional infliction of emotional distress], [P]laintiff must show that [Defendant] 'engaged in outrageous conduct, done intentionally or with reckless disregard of the probability of causing emotional distress, resulting in the suffering of extreme emotional distress, actually or proximately caused by the outrageous conduct.'" *Cate v. City of Burlington*, 2013 VT 64, ¶ 28, 194 Vt. 265, 276-77, 79 A.3d 854, 862-63 (2013) (quoting *Fromson v. State*, 2004 VT 29, ¶ 14, 176 Vt. 395, 399, 848 A.2d 344, 347).  Plaintiff's burden is "a heavy one." *Dulude v. Fletcher Allen Health Care, Inc.*, 807 A.2d 390, 398 (Vt. 2002) (internal quotation marks omitted).  "The conduct must be so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and be regarded as atrocious, and utterly

intolerable in a civilized community." *Denton v. Chittenden Bank*, 655 A.2d 703, 706 (Vt. 1994) (internal quotation marks and ellipses omitted). "The test is objective; the plaintiff must show that the harm resulting from the inflicted distress was so severe that no reasonable person could be expected to endure it." *Farnum v. Brattleboro Retreat, Inc.*, 671 A.2d 1249, 1256 (Vt. 1995). "It is for the court to determine as a threshold question whether a jury could reasonably find that the conduct at issue [in this case] meets this test." *Jobin v. McQuillen*, 609 A.2d 990, 993 (Vt. 1992).

Defendant had arguable probable cause to arrest and charge Plaintiff and his use of force was objectively reasonable under the circumstances of this case. Plaintiff cannot establish that Defendant's conduct was, as a matter of law, "so outrageous in character and so extreme in degree as to go beyond all possible bounds of decent and tolerable conduct in a civilized community." *Farnum*, 671 A.2d at 1256. Defendant is therefore entitled to judgment as a matter of law in his favor regarding Plaintiff's state law claim of intentional infliction of emotional distress. *Jobin*, 609 A.2d at 993; *see also Denton*, 655 A.2d at 706 (affirming grant of summary judgment because the alleged "conduct did not, as a matter of law, reach the level of extreme outrage" sufficient for such a claim). The court therefore GRANTS Defendant's motion for summary judgment on Count Two.

## CONCLUSION

For the foregoing reasons, the court GRANTS Defendant Richard Wells's Motion for Summary Judgment. (Doc. 26.)

SO ORDERED.

Dated at Burlington, in the District of Vermont, this *17th* day of March, 2015.

Christina Reiss, Chief Judge
United States District Court